UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT


April J. Manney,

      Plaintiff,

      v.                                 Civil Action No. 5:09-CV-255

Michael J. Astrue,
Commissioner of Social Security,

      Defendant.


## <u>REPORT AND RECOMMENDATION</u>
(Docs. 8 and 10)

     Claimant April Manney brings this action pursuant to 42 U.S.C. § 405(g) of the

Social Security Act, requesting review of the decision of the Commissioner of Social

Security ("Commissioner") not to reopen her two earlier applications for disability

insurance benefits, and alleging that the Commissioner's decision violated her

constitutional right to due process of law as a person with a mental illness.  Pending

before the court are Manney's Motion seeking an order reversing the Commissioner's

decision (Doc. 8), and the Commissioner's Motion seeking an order affirming the same

(Doc. 10).

     For the reasons explained below, I recommend that Manney's Motion (Doc. 8) be

GRANTED, in part, and the Commissioner's Motion (Doc. 10) be DENIED.

## Manney's Background/Procedural History

Manney was born on August 3, 1967, and has completed school through the eleventh grade.  (Administrative Record ("AR") 99, 108, 119.)  She has worked as a cashier, a stocker, and a fabrication operator (making microchips).  (AR 114, 347.)

### A.    Medical History

On July 14, 1993, Manney sustained a hydrofluoric acid burn to her right hand, resulting in severe injury and disability to her hand, and the eventual occurrence of reflex sympathetic dystrophy[1].  (AR 181, 195-96.)  In June 1996, Dr. Julie Willey opined that, as a result of her injury, Manney had "significant hand deformity[,] significant causalgic deformity[,]" and "little or no motion of the digits."  (AR 183-84.)  In December 1998, Dr. John Leppman opined that, for some time, Manney "had no effective use of her right hand and arm."  (AR 181.)

In addition to having hand and arm problems, Manney has been diagnosed with type 2 diabetes and a seizure disorder.  (AR 327, 337, 347.)  She also has a history of recurrent infections, incisions, and drainages involving the right breast; nephrolithiasis[2]; and ovarian cyst.  (*Id.*, AR 379-87, 397-400, 411-12.)  In April 1999, Manney was admitted to the Emergency Room at Springfield Hospital, complaining of "facial

---

[1] "Reflex sympathetic dystrophy," otherwise known as "RSD," "complex regional pain syndrome type I," and "CRPS," is defined as "diffuse persistent pain usually in an extremity often associated with vasomotor disturbances, trophic changes, and limitation or immobility of joints; frequently follows some local injury."  STEDMAN'S MEDICAL DICTIONARY 1895 (28th ed. 2006).

[2] "Nephrolithiasis" is defined as "[p]resence of renal calculi."  STEDMAN'S MEDICAL DICTIONARY 1290 (28th ed. 2006).

swelling" and "significant post nasal drip."  (AR 430.)  She was diagnosed with sinusitis and treated with Amoxicillin.  (*Id.*)

More relevant to the instant Motions, Manney also has a history of psychological and alcohol-related problems.  In May 1999, she spent nine days as an inpatient at Springfield Hospital, presenting with severe malnutrition and dehydration.  (AR 431-37.) In the Emergency Room note documenting her admission into the Hospital, Certified Physician Assistant John Bond noted that Manney's "friends and neighbors" indicated that she had been drinking excessive amounts of alcohol, but Manney herself stated that she had had "only . . . 2 drinks at night."  (AR 431.)  Manney was diagnosed with B12 deficiency, neurotic depression, and alcohol abuse, among other disorders.  (AR 433-34.) It was noted that Manney had "severe insomnia" during her stay in the Hospital, and that she "describe[d] anxiety and agoraphobia[3] that she ha[d] been having for some time." (AR 434.)  Dr. Elijah Stommel opined that Manney "may have some serious psychological problems," but noted that "the details [we]re not clear."  (AR 436.)

On May 17, 2001, Manney presented to the Springfield Hospital "for detox."  (AR 438.)  Certified Physician Assistant William Hoser indicated in the Emergency Room note that Manney "states that she wants to have some formal help so she can stop drinking alcohol.  She reports that she has been drinking a half gallon of Black Velvet every two to three days for the past several months."  (*Id.*)  Manney was discharged home

---

[3] "Agoraphobia" is defined as "[a] mental disorder characterized by an irrational fear of leaving the familiar setting of home, or venturing into the open, so pervasive that a large number of external life situations are entered into reluctantly or are avoided; often associated with panic attacks." STEDMAN'S MEDICAL DICTIONARY 40 (28th ed. 2006).

3

with her sisters that day, and provided with contact information for Maple Leaf Treatment Center in Underhill, Vermont.  (AR 439.)

In the winter of 2002, Manney spent approximately three weeks in psychiatric treatment at the Windham Center at Springfield Hospital, and then approximately one month at Recovery House in Wallingford, Vermont.  (AR 440-49.)  Manney's principal diagnosis at the Windham Center was agoraphobia with panic attacks.  (AR 440.)  Secondary diagnoses included alcohol dependence and withdrawal.  (*Id.*)  In a consultation report prepared by psychologist Richard Root II, Ed.D., it was noted that Manney "may be self[-]medicating through alcohol use because of [her panic attacks, agoraphobia, and RSD]."  (AR 444.)  Upon discharge from Recovery House, Manney was diagnosed with alcohol dependence and anxiety disorder.  (AR 448.)  In the discharge summary, Dr. Ray Abney noted that, when Manney was first admitted to the Hospital, she exhibited "[P]arkinson-like" symptoms, including "poor balance, decreased coordination[,] and a stiff mask-like facial appearance," but "psychological testing did not suggest significant organicity" and "[n]eurologic consultation indicated a basically normal neuro exam."  (AR 441.)

On October 19, 2006, psychologist Dr. Craig Knapp performed a detailed psychological evaluation of Manney's mental status, finding that she presented with "symptoms of pervasive depression and anxiety, although she is not currently being treated for those conditions, either medically or by a therapist."  (AR 351.)  Dr. Knapp diagnosed Manney with the following psychological conditions:  depressive disorder

(dysthymia)[4], panic disorder with agoraphobia, and alcohol dependence (in recovery for five years). (AR 351.) The Doctor concluded that, although Manney "would most likely be able to understand, remember, and carry out instructions in a work setting and could also most likely relate adequately to supervisors and others in a work setting," her ability to respond to ongoing demands and pressures in a work setting "would most likely be impacted on . . . by . . . her levels of depression and anxiety which appear to be significant." (AR 352.)

### B.   Procedural History

In September 1998, Manney filed an application for disability insurance benefits, alleging a disability onset date of July 14, 1993. (AR 171.) The application was denied initially and upon reconsideration, and Manney did not request a hearing before an Administrative Law Judge ("ALJ"). Then in August 2002, Manney filed another application for disability insurance benefits, again alleging a disability onset date of July 14, 1993. (AR 209.) That application was also denied initially and upon reconsideration, and again, Manney did not request a hearing. The doctrine of res judicata was applied to deny the August 2002 claim, on the grounds that Manney supplied no new or material evidence and did not allege that "she was late in filing an appeal [of the earlier September 1998 claim] based upon a good faith reliance on incorrect, incomplete or misleading information given by [the] SSA regarding the effects of reapplying instead of appealing."

---

[4] "Dysthymia" is defined as "[a] chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness." STEDMAN'S MEDICAL DICTIONARY 602 (28th ed. 2006).

(AR 212.)  Manney was not represented by counsel with respect to either her 1998 or
2002 claim.

On or around April 25, 2006, Manney filed a third application, this time for
supplemental security income ("SSI") benefits, which application is the subject of this
action.  (AR 99, 108.)  Therein, Manney alleges that the following conditions limited her
ability to work from July 14, 1993, the alleged disability onset date, through December
31, 1998, her date last insured ("DLI"): reflex sympathetic nerve dystrophy, diabetes,
seizures, depression, carpal tunnel syndrome, severe TMJ[5], a slipped disc in her neck, and
breast cysts.  (AR 99, 108, 111, 113.)  The application was denied initially and on
reconsideration.  (AR 45, 47.)  Through counsel, Manney timely requested an
administrative hearing, which occurred before ALJ Frederick Harap on April 9, 2008 and
August 27, 2008, respectively.  (AR 31-37, 38-44.)

Immediately prior to the April 2008 hearing, Manney's counsel, Bryden Dow,
submitted an "Amended Request to Reopen Prior Decisions for Good Cause" and
supporting medical evidence material to her 1998 and 2002 applications, arguing that the
applications should be reopened on the grounds that, during the appeal periods for those
applications, Manney was unrepresented and had a mental incapacity which prevented
her from acting on her right to appeal.  (AR 23, 33-35, 141-66, 429-52.)  Some time
thereafter, Attorney Dow submitted to the ALJ a letter dated August 22, 2008 from
Manney's treating psychologist, Dr. Neil Marinello, wherein Dr. Marinello opined that

---

[5] "TMJ" is a colloquial abbreviation for "temporomandibular joint dysfunction," which is defined
as "chronic or impaired function of the temporomandibular articulation."  STEDMAN'S MEDICAL
DICTIONARY 596, 1994 (28th ed. 2006).

Manney's "ability to file an appeal before an [ALJ] was definitely affected by her panic disorder and agoraphobia."  (AR 12, 460.)  When asked by the ALJ at the August 27, 2008 hearing why she did not appeal her 1998 and 2002 claims, Manney stated that "[she] was scared."  (AR 42.)  The ALJ further inquired of Manney what happens when she gets scared, and she replied, "[s]ometimes I hyperventilate, get anxiety, panic attacks."  (AR 43.)

On May 29, 2008 and September 4, 2008, respectively, ALJ Harap issued decisions finding that Manney had been under a disability, as defined in the Social Security Act, from April 25, 2006, the date of her application, through the dates of the decisions.[6]  (AR 16, 28.)  However, the ALJ denied Manney's request to reopen the 1998 and 2002 applications, finding that good cause had not been established and there was no basis for finding that Manney's impairments prevented her from pursuing the prior claims.[7]  (AR 12, 23.)  Manney requested review of the ALJ's September 2008 decision, and on September 23, 2009, the Appeals Council denied review, making such decision final.  (AR 1.)  In conjunction with its denial, the Appeals Council issued an Order noting its receipt of additional evidence which it made part of the record, including a

___

[6] The ALJ noted that, although Manney had alleged an onset date of July 14, 1993, "supplemental security income does not become payable until the month after the month in which the application is filed, assuming all eligibility requirements are met (20 C.F.R. § 416.335)."  (AR 12-13, 24.)  Thus, regardless of Manney's alleged onset date, the earliest Manney could begin receiving benefits based on her April 25, 2006 application for SSI benefits was on May 25, 2006, one month after the application was filed.  *See* 20 C.F.R. § 416.335 ("When you file an application in the month that you meet all the other requirements for eligibility, the earliest month for which we can pay you benefits is the month following the month you filed the application.").

[7] In his September 2008 decision, the ALJ stated that he "reopened" his May 2008 decision "to provide an opportunity for further development and consideration of [Manney's] contention that the denials of her prior claims for disability insurance benefits should be reopened by application of the provisions of Social Security Ruling 91-5p."  (AR 11.)

Memorandum dated November 1, 2008 from Attorney Dow, wherein Dow again argued that Manney's mental impairment was the reason she did not appeal the 1998 and 2002 decisions.  (AR 5, 237.)

On November 18, 2009, Manney filed a Complaint against the Commissioner, initiating this action.

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is so engaged, he is not considered disabled.  If the claimant is not engaged in substantial gainful activity, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires him to make a determination as to whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if the impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984); *Gravel v. Barnhart*, 360 F. Supp. 2d 442, 445 (N.D.N.Y. 2005).  If the claimant is not presumptively disabled, the fourth step requires the ALJ to consider whether the claimant's "residual functional capacity" ("RFC") precludes the performance of his or her past relevant work.  20 C.F.R.

§§ 404.1520(f), 416.920(f). The fifth and final step requires the ALJ to determine whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g).

The claimant bears the burden of proving his case at steps one through four, *Butts v. Barnhart*, 388 F.3d at 383, and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's residual functional capacity").

Employing this five-step analysis, in his September 2008 decision, ALJ Harap first determined that Manney had not engaged in substantial gainful activity from her alleged onset date of April 25, 2006. (AR 14.) At steps two and three, the ALJ found that Manney has severe impairments of "reflex sympathetic dystrophy, bilateral upper extremity limits[,] and agoraphobia[,]" but that none of these impairments met or medically equaled a listed impairment. (*Id.*) Next, the ALJ determined that Manney has the RFC to perform sedentary work, but that she has no use of her right upper extremity, cannot lift and carry more than ten pounds with her left hand, and cannot perform at a consistent pace or handle routine changes in a work setting due to her anxiety. (*Id.*) Given these limitations, the ALJ concluded that Manney was unable to perform any past relevant work and that there are no jobs existing in significant numbers in the national economy that Manney can perform. (AR 15-16.) Therefore, the ALJ found that Manney was disabled since April 25, 2006, the date the application was filed. (AR 16.)

As noted above, however, the ALJ denied Manney's request to reopen the 1998 and 2002 applications, on the grounds that there was no basis for finding that Manney's impairments prevented her from pursuing the prior claims.  (AR 12.)  The ALJ came to this conclusion, even after considering Dr. Marinello's opinion that Manney's ability to file an appeal with respect to her 1998 and 2002 applications "was definitely affected by her panic disorder and agoraphobia."  (AR 12, 460.)  The ALJ explained:

> Notwithstanding Dr. Marinello's stated opinion regarding evidence of agoraphobia and the likelihood of an avoidance response, in the absence of evidence describing a clear history of ongoing difficulty engaging in the activities required to pursue an appeal, the undersigned finds no basis for finding that the claimant's impairments as they existed during this period prevented her from pursuing her claim.  Although the record does include evidence of treatment for alcohol dependence, panic attacks, and agoraphobia, there is no evidence to substantiate a claim that these impairments were of such severity on an ongoing basis as to prevent the claimant from appealing her denials, particularly considering the complete lack of such treatment records between May 1999 and January 2002.  In the absence of evidence of an inability to understand the procedures for requesting review, consistent with the guidance in SSR 91-5p, the undersigned finds no basis for extending the time in which the prior claims may be reopened or the time available for appealing the claimant's denial.

(AR 12.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but

cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In reviewing a Commissioner's disability decision, the court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  A court's factual review of the Commissioner's decision is limited to determining whether "substantial evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).  "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Poupore v. Astrue*, 566 F.3d at 305.

In determining whether an ALJ's findings are supported by substantial evidence, the court must consider "the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  Additionally, the court "'must . . . be satisfied that the claimant has had a full hearing under the Commissioner's regulations and in accordance with the beneficent purposes of the [Social Security] Act.'"  *Jones v. Apfel*, 66 F. Supp. 2d 518, 522 (S.D.N.Y. 1999) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)).  In reviewing the evidence, the

11

court must determine if the ALJ set forth the "crucial factors" justifying his or her findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Willis v. Comm'r of Soc. Sec.*, No. 6:05-CV-611, 2008 WL 795004, at *1 (N.D.N.Y. Mar. 24, 2008); *see also Ferraris v. Heckler*, 728 F.2d at 587.

The reviewing court's role with respect to the Commissioner's disability decision is "'quite limited[,] and substantial deference is to be afforded the Commissioner's decision.'" *Hernandez v. Barnhart*, No. 05 Civ. 9586, 2007 WL 2710388, at *7 (S.D.N.Y. Sept. 18, 2007) (quoting *Burris v. Chater*, No. 94 Civ. 8049, 1996 WL 148345, at *3 (S.D.N.Y. Apr. 2, 1996)). The court should not substitute its judgment for that of the Commissioner. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998). The Second Circuit explained: "The entire thrust of judicial review under the disability benefits law is to ensure a just and rational result between the government and a claimant, without substituting a court's judgment for that of the Secretary, and to reverse an administrative determination only when it does not rest on adequate findings sustained by evidence having 'rational probative force.'" *Williams v. Bowen*, 859 F.2d at 258 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. at 230). Therefore, if the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists. *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990); *DeChirico v. Callahan*, 134 F.3d 1177, 1182-83 (2d Cir. 1998).

Finally, the Social Security Act "must be construed liberally because it is a remedial statute that is intended to include, rather than exclude, potential recipients of benefits." *Jones v. Apfel*, 66 F. Supp. 2d at 522; *Dousewicz v. Harris*, 646 F.2d 771, 773 ("In its deliberations the District Court should consider the fact that the Social Security Act is a remedial statute to be broadly construed and liberally applied.").

### Analysis

Manney asserts that the Commissioner's refusal to reopen the 1998 and 2002 applications violated her right to due process of law because of Manney's impaired mental state, and that the Commissioner erred in failing to give controlling weight to Dr. Marinello's opinion regarding Manney's inability to file an appeal. (Doc. 8.) In addition, Manney argues that the Commissioner erred in failing to consider new and material evidence to establish an onset date of disability consistent with Dr. Marinello's opinion. (*Id.*) The Commissioner refutes these assertions, and counters that the ALJ's decision is supported by substantial evidence and complies with the applicable legal standards. (Doc. 10.) For the reasons explained below, I recommend finding in favor of Manney, in part, and against the Commissioner.

## I.   Reopening Manney's 1998 and 2002 Applications

As stated above, after her 1998 and 2002 applications were denied initially and on reconsideration, Manney failed to file a request for an ALJ hearing. Pursuant to 20 C.F.R. § 416.1433(b), a claimant may request a hearing "within 60 days after the date [he or she] receive[s] notice of the previous determination or decision." *See also* 20 C.F.R. § 404.933(b). The notice denying Manney's request for reconsideration of the 1998

application was issued on April 30, 1999 (AR 174); and the notice denying Manney's

request for reconsideration of the 2002 application was issued on September 26, 2003

(AR 215). Therefore, Manney should have filed a request for an ALJ hearing on some

date approximately from May through July 1999 with respect to her 1998 application,

and from October through December 2003 with respect to her 2002 application.

In cases where a claimant fails to request a hearing or appeal during the time

periods prescribed in the regulations, a claim may be "reopened" within twelve months of

the date of the notice of initial decision "for any reason," or within four years of the date

of such notice upon a showing of "good cause." 20 C.F.R. § 404.988(a), (b). In this

case, those time periods expired with respect to both Manney's 1998 and 2002 claims

long before Attorney Dow submitted Manney's "Amended Request to Reopen Prior

Decisions for Good Cause" in April 2008. (*See* AR 141-44.) Specifically, the notices of

initial decision with respect to Manney's 1998 and 2002 claims were issued on December

21, 1998 (AR 180) and August 19, 2002 (AR 212), respectively. Therefore, Manney's

1998 claim could have been reopened by December 1999 for any reason and by

December 2002 for good cause, and her 2002 claim could have been reopened by August

2003 for any reason and by August 2006 for good cause. Manney waited, however, until

April 2008 to request that her 1998 and 2002 claims be reopened.

Despite the regulations' limitations on the time period for reopening claims, "[i]t

has always been SSA policy that failure to meet the time limits for requesting review is

not automatic grounds for dismissing the appeal and that proper consideration will be

given to a claimant *who presents evidence that mental incapacity may have prevented*

14

*him or her from understanding the review process*."  Social Security Ruling ("SSR") 91-5p, at *2 (S.S.A. Jul. 1, 1991) (emphasis added).  Therefore, SSR 91-5p provides for an extension of time to reopen claims brought by mentally impaired claimants:

> When a claimant presents evidence that mental incapacity prevented him or her from timely requesting review of an adverse determination . . . at the time of the prior administrative action, [the] SSA will determine whether or not good cause exists for extending the time to request review.  If the claimant satisfies the substantive criteria, the time limits in the reopening regulations do not apply; so that, regardless of how much time has passed since the prior administrative action, the claimant can establish good cause for extending the deadline to request review of that action.

*Id.*  The ruling continues, listing the factors to consider in determining whether a claimant had a mental impairment at the time of the prior administrative action:

> The claimant will have established mental incapacity for the purpose of establishing good cause *when the evidence establishes that he or she lacked the mental capacity to understand the procedures for requesting review*.
>
> In determining whether a claimant lacked the mental capacity to understand the procedures for requesting review, the adjudicator must consider the following factors as they existed at the time of the prior administrative action:
>
> —inability to read or write;
>
> —lack of facility with the English language;
>
> —limited education;
>
> —*any mental or physical condition which limits the claimant's ability to do things for him/herself*.
>
> If the claimant is unrepresented and has one of the factors listed above, the adjudicator will assist the claimant in obtaining any relevant evidence.  The decision as to what constitutes mental incapacity must be based on all the pertinent facts in a particular case.  The adjudicator will resolve any reasonable doubt in favor of the claimant.

*Id.* (emphasis added).

Applying these factors here, the evidence demonstrates that Manney was able to read and write, and did not lack facility with the English language at the time of the prior administrative actions. (AR 112.) Moreover, she has an eleventh grade education, did not attend special education classes, and has completed special job training courses. (AR 119.) In January 2002, although consulting psychologist Dr. Richard Root II opined that Manney's Wechsler Memory Scale scores suggested "significantly low working memory skills," he noted that Manney's "memory skills [we]re broadly within the low average to average range." (AR 443.) Dr. Root further noted that, although Manney's Global Assessment of Functioning ("GAF") score was 35-45,[8] indicating serious symptoms, her results on the Folstein mini mental state examination – which is used to screen for cognitive impairment – demonstrated that she was "broadly within the normal range for her age and educational levels." (*Id.*) Furthermore, a few months later, in March 2002, Manney's GAF score was up to 58,[9] indicating only moderate symptoms.

The only remaining factor under SSR 91-5p, other than the fact that Manney was unrepresented by counsel during the appeal periods, is whether Manney's mental

---

[8] "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'" *Kohler v. Astrue*, 546 F.3d 260, 262, fn. 1 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000)). Manney's GAF score of 35-45 places her between the categories of "31-40," where a person experiences "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood," and "41-50," where a person experiences "[s]erious symptoms . . . OR any serious impairment in social, occupation, or school functioning." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994).

[9] A GAF score between 51 and 60 indicates "[m]oderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994).

condition limited her "ability to do things for . . . herself" during the periods when she should have filed requests for an ALJ hearing.  There is demonstrable evidence that Manney was unable to do things for herself while she was admitted to Springfield Hospital in May 1999.  The admitting diagnosis was "[v]omiting [and] dehydration," and upon discharge, Manney's principal diagnosis was "B12 deficiency."  (AR 432, 434.) Although these diagnoses do not appear to be related to a mental defect, a secondary diagnosis was "neurotic depression" (AR 434), and treatment records from Manney's May 1999 hospital stay clearly reference an underlying and ongoing mental disorder. Specifically, in the Discharge Summary Report, Dr. Caloras noted that Manney had "a history of anxiety disorder and depression," suffered from "severe insomnia while in the hospital," and "describe[d] anxiety and agoraphobia that she ha[d] been having for some time."  (AR 434.)  In a neurology consultation report dated May 25, 1999, Dr. Stommel stated:  "[T]he patient may have some serious psychological problems although the details are not clear."  (AR 436.)

There is also evidence demonstrating that Manney was unable to do things for herself during the winter of 2002, when she was admitted for twenty days of psychiatric hospitalization at the Windham Center and for subsequent rehabilitation at Recovery House.  (AR 440-49.)  Although Dr. Abney stated that psychological testing on Manney "did not suggest significant organicity" and revealed a "basically normal neuro exam," he noted that Manney reported having "panic attacks starting two years ago . . . up to three times a week[,]" and that Manney "stay[ed] at home to avoid" these panic attacks.  (AR 441.)  After Manney's treatment at the Windham Center had concluded, on March 14,

2002, Dr. Abney's principal diagnosis was "agoraphobia with panic [attacks]." (AR 440.) During the same period of hospitalization, consulting psychologist Dr. Root evaluated Manney, similarly diagnosing her with "[p]anic attack[s] with agoraphobia," among other things, and noting that she "reports . . . avoid[ing] going places because of [her significant anxiety attacks]." (AR 443.) Dr. Root further opined that Manney "may be self[-]medicating through alcohol use" as a result of her agoraphobia, panic attacks, and RSD. (AR 444.)

In *Byam v. Barnhart*, 336 F.3d 172 (2d Cir. 2003), the Second Circuit analyzed SSR 91-5p, holding that, in order for a claimant to establish that mental illness prevented him or her from proceeding from one administrative level to another, he or she must make a "particularized allegation of mental impairment plausibly of sufficient severity to impair comprehension." *Byam*, 336 F.3d at 182 (citing *Stieberger v. Apfel*, 134 F.3d 37, 40-41 (2d Cir. 1997)). The *Byam* standard requires inquiry into not only whether the claimant could understand administrative and legal procedures, but also whether he or she could in fact *pursue* these procedures. *Id.* at 182-83 (citing *Stieberger*, 134 F.3d at 40).

*Byam* involved facts very similar to those involved here. An ALJ awarded the claimant SSI benefits for the fourth of four applications but refused to reopen the first three applications for which the claimant had failed to request a hearing. *Byam*, 336 F.3d at 178. The claimant had requested a reopening of the previous applications based on alleged mental impairments that prevented her from following through on the appeals process. *Id.* The ALJ refused to reopen the prior applications, and the district court

18

granted summary judgment in favor of the Commissioner, finding that the claimant's medical history before 1996 "'f[ell] short of establishing sufficient severity to impair comprehension' of the administrative process." *Id.* at 179 (quoting *Byam v. Massanari*, No. 2:00-CV-149, at *16 (D. Vt. Jul. 5, 2001)).  The claimant appealed, and the Second Circuit reversed, holding that the ALJ should have inquired, (1) whether the claimant's prior applications were denied as a result of her mental capacity under 20 C.F.R. § 416.1488(c), and (2) "whether [the claimant] had any mental or physical conditions that limited her 'ability to do things for [her]self,' in accordance with SSR 91-5p." *Byam*, 336 F.3d at 178 (quoting SSR 91-5p, at *2).  The appeals court further held that the district court improperly "focused on comprehension and not on ability to follow through," *id.* at 181, explaining as follows:

> *Stieberger* made clear . . . that a claimant's argument that she was so impaired as to be unable to pursue administrative remedies requires more than a "generalized allegation" of confusion; it requires a "particularized allegation of mental impairment plausibly of sufficient severity to impair comprehension." *Stieberger*, 134 F.3d at 40-41.

> The district court in this case interpreted *Stieberger* to hold that "notice of an adverse benefits determination to an unrepresented claimant who is unable to comprehend it because of mental impairments may be constitutionally deficient," and the court concluded that Byam's claim "falls short of establishing 'sufficient severity to impair comprehension' of the administrative process." *Byam v. Massanari*, No. 2:00-CV-149, at 13, 16 (quoting *Stieberger*, 134 F.3d at 41).  However, the district court failed to make the further inquiry under *Stieberger* into whether the claimant could "act upon notice." *Stieberger*, 134 F.3d at 40 (quoting [*Canales v. Sullivan*, 936 F.2d 755, 758 (2d Cir. 1991)]).

*Id.* at 182.

19

In contrast to the ALJ in *Byam*, the ALJ in this case explicitly considered the "provisions" and "guidance" of SSR 91-5p (AR 11-12), and appears to have considered not just Manney's "comprehension" of review procedures, but also her "ability to follow through" with those procedures. *Byam*, 336 F.3d at 181. Demonstrating his consideration of the latter issue, the ALJ stated in his September 2008 decision:

> Notwithstanding Dr. Marinello's stated opinion regarding evidence of agoraphobia and the likelihood of an avoidance response, in the absence of evidence describing a clear history of ongoing difficulty *engaging in the activities required to pursue an appeal*, the undersigned finds no basis for finding that [Manney's] impairments as they existed during this period prevented her from *pursuing her claim*.

(AR 12 (emphasis added).) The ALJ erred, however, in requiring evidence additional to that required under the applicable regulatory and case law, especially considering SSR 91-5p's requirement that, "[i]n determining whether a claimant lacked the mental capacity to understand the procedures for requesting review, . . . [t]he adjudicator will resolve any reasonable doubt in favor of the claimant." SSR 91-5p at *2. Specifically, the ALJ's requirements that Manney must show "a *clear history of ongoing difficulty* engaging in the activities required to pursue an appeal" and impairments "*of such severity on an ongoing basis* as to prevent [Manney] from appealing her denials" are not reflected in the law. (AR 12 (emphasis added).) Rather, as quoted above, *Byam* (interpreting SSR 91-5p) requires only "a particularized allegation of mental impairment plausibly of sufficient severity to impair comprehension" during the relevant period. *Byam*, 336 F.3d at 182 (citing *Stieberger*, 134 F.3d at 40-41).

Under *Byam*, the question is simply "whether [the claimant] was impaired in her ability to understand and pursue administrative and legal procedures." *Id.* at 183. Applying this standard, the court in *Byam* found that evidence of the claimant's "long history of depression, suicidal ideation with specific suicide attempts, and numerous evaluations around the dates of her SSI applications documenting specific mental disorders and cognitive, social, and emotional impairments" was "sufficiently particularized and severe to meet *Stieberger's* threshold allegation requirement and to answer the Commissioner's motion for summary judgment." *Id.* Likewise, here, the medical evidence submitted to the ALJ – which includes (1) diagnoses of agoraphobia and panic attacks by multiple treating medical professionals around the dates of Manney's 1998 and 2002 claims and the appeal periods with respect thereto, (2) the opinion of consulting psychologist Dr. Knapp in 2006 that Manney suffered from depressive disorder and panic disorder with agoraphobia (AR 351), and (3) the opinion of treating physician Dr. Marinello in 2008 that Manney's ability to file an appeal was "definitely affected by her panic disorder and agoraphobia" (AR 460) – is sufficiently particularized and severe to meet the *Byam/Stieberger* allegation requirement, and adequately demonstrates that Manney was impaired in her ability to understand and pursue administrative and legal procedures during the relevant periods.

The Commissioner contends that the fact that Manney was able to file her 1998 and 2002 claims, and requests for reconsideration thereof, without the assistance of counsel, around the same period that her appeals of these claims would have been due, demonstrates that Manney was able to understand and engage in activities required to

timely pursue these appeals.  I am not persuaded by this argument, however, especially in the face of the significant countervailing evidence discussed above.  Manney's particular primary mental defect, agoraphobia, is characterized by an "irrational fear of leaving the familiar setting of home," such that individuals suffering from such disorder enter into "a large number of external life situations . . . reluctantly," or avoid them altogether. STEDMAN'S MEDICAL DICTIONARY 40 (28th ed. 2006).  It is entirely consistent with the diagnosis of agoraphobia that Manney would have the ability to file a claim and even file a request for reconsideration of such claim, but not have the ability to take the next step of seeking a hearing with respect to the denial of such claim, for fear of having to leave home and appear before a judge.  *See Byam*, 336 F.3d at 183 (noting that, although "[d]epression and social phobia might not prevent one from holding certain jobs, . . . they may impede one's ability to act on notice or go to a hearing").

Accordingly, I recommend finding that the ALJ applied an incorrect legal standard in considering Manney's request to reopen her prior claims, and that the ALJ's determination that there was insufficient evidence to find that Manney's mental condition at the relevant periods prevented her from timely pursuing her administrative remedies is not supported by substantial evidence.

## II.     Treating Physician's Opinion

I also recommend finding that the ALJ erred in his treatment of Dr. Marinello's medical opinion.  As noted above, in an August 22, 2008 letter to Attorney Dow, Dr. Marinello opined that Manney's agoraphobia "was profoundly impacting her life by at least August 1998[, and] her abuse of alcohol was self-medication to deal with the panic

attacks and agoraphobic avoidance behaviors which were becoming severe by 3/30/94."
(AR 460.)  The Doctor concluded:  "[M]y professional opinion within a reasonable
degree of psychological certainty is that [Manney's] ability to file an appeal before an
administrative law judge was definitely affected by her panic disorder and agoraphobia[,
and] not filing an appeal is a classic avoidance response to an obvious anxiety-provoking
situation."  (*Id.*)  In the letter, Dr. Marinello stated that he had been treating Manney since
June 17, 2008, and had compiled his opinion based on approximately ten contacts,
including emergency telephone calls and last minute cancellations, from that date until
the date of the letter, August 22, 2008.  (*Id.*)  He also stated that his opinion was based on
his review of Manney's "extensive clinical notes and history," as well as on his
"interpretation of her MMPI-2 raw test protocol" and his review of Manney's 1998 and
2002 social security applications.  (*Id.*)

   Manney contends that the ALJ erred by failing to give the opinion of Dr.
Marinello appropriate weight under the treating physician rule.  The "treating physician
rule," as stated in 20 C.F.R. § 404.1527(d)(2), provides that the ALJ must give a treating
physician's opinion as to the claimant's disability "controlling weight," so long as that
opinion is "well-supported by medically acceptable clinical and laboratory diagnostic
techniques and is not inconsistent with the other substantial evidence in [the] case
record."  *See Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).  With regard
to retrospective opinions, it is established law in the Second Circuit that, "while a treating
physician's retrospective diagnosis is not conclusive, it is entitled to controlling weight
unless it is contradicted by other medical evidence or 'overwhelmingly compelling' non-

medical evidence." *Byam*, 336 F.3d at 183; *see also Rivera v. Sullivan*, 923 F.2d 964 (2d Cir. 1991). Not only is Dr. Marinello's opinion not contradicted by other medical evidence or "overwhelmingly compelling" non-medical evidence, it is supported by other medical evidence, including Manney's hospital notes and treatment reports during the relevant period, as discussed above.

The Commissioner asserts that the treating physician rule does not apply here because Dr. Marinello was not a "treating physician" for purposes of the rule, given that he did not begin treating Manney until June 2008, nearly ten years after Manney filed her 1998 claim, and he treated her for only approximately two months prior to the date of his opinion.[10] In *Schisler v. Bowen*, 851 F.2d 43, 46 (2d Cir. 1988), the Second Circuit defined a "treating physician" as follows: "[a] claimant's . . . own physician . . . or psychologist . . . who has provided the [claimant] with medical treatment or evaluation and who has or had an ongoing treatment and physician-patient relationship with the individual." The court continued: "The nature of the physician's relationship with the patient, rather than its duration or its coincidence with a claim for benefits, is determinative." *Id.*; *see Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 54-55 (2d Cir. 1992) (citing rule that "[t]he *nature*--not the length--of the [physician-patient] relationship is controlling," and holding that, where physicians treated claimant only from June to October 1987, but examined him on at least nine occasions, prescribed medication for him, ordered and examined a CAT scan, put him on a regimen of physical therapy, and

---

[10] Noteworthy, the ALJ does not appear to take this position, instead stating in his September 2008 opinion that Dr. Marinello was "[Manney's] current treating psychologist." (AR 12.)

ultimately recommended a myelogram procedure with a view toward surgery, they were "treating physicians" under "treating physician rule," and thus their views were entitled to "special deference") (emphasis in original); *Vargas v. Sullivan*, 898 F.2d 293, 294 (2d Cir. 1990) (applying treating physician rule to doctor who had been treating claimant for only three months).

Applying the *Schisler* definition of "treating physician" here, Dr. Marinello was Manney's psychologist; he was providing Manney with medical treatment (therapy) and evaluation.  Dr. Marinello's opinion letter references his "therapeutic treatment" of Manney and his receipt of multiple "emergency telephone calls" from Manney during the treatment period, reflecting the existence of a physician-patient relationship.  (AR 460.) Moreover, Dr. Marinello had an ongoing – albeit brief as of the date of his August 2008 opinion – treatment and physician-patient relationship with Manney.  Although the Second Circuit has held that doctors who see a patient only once do not have a chance to develop an ongoing relationship with the patient and thus are generally not considered treating physicians, *see Garcia v. Barnhart*, No. 01 Civ. 8300, 2003 WL 68040, at *5, fn. 4 (S.D.N.Y. Jan. 7, 2003) (citing *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); *Jones v. Apfel*, 66 F. Supp. 2d 518, 525 (S.D.N.Y. 1999)), Dr. Marinello had "approximately ten contacts," including emergency telephone calls and last minute cancellations, with Manney within the approximate two-month period prior to the date of the August 2008 letter (AR 460).  Therefore, Dr. Marinello meets the Second Circuit's definition of a "treating physician"

The Commissioner cites to *Arnone v. Bowen*, 882 F.2d 34, 41 (2d Cir. 1989), among other cases, for the proposition that there was no treating physician relationship between Dr. Marinello and Manney because Dr. Marinello did not treat Manney during the relevant periods.  In *Arnone*, the Second Circuit held that, where the claim depended on a showing of continuous disability from 1977-1980, a doctor who treated the claimant several times in 1974 and 1975 and once in 1987, was not a "treating physician" within the meaning of the treating physician rule because "there simply was no ongoing physician-treatment relationship between" the claimant and the doctor during the relevant period.  *Id.* (internal quotations and citations omitted).  But it is well-settled law in this Circuit that, "[a] diagnosis of a claimant's condition may properly be made even several years after the actual onset of the impairment."  *Dousewicz v. Harris*, 646 F.2d 771, 774 (2d Cir. 1981) (quotation marks and citations omitted).  "Such a diagnosis must be evaluated in terms of whether it is predicated upon a medically accepted clinical diagnostic technique and whether considered in light of the entire record, it establishes the existence of [an impairment during the relevant period]."  *Id.* (quotation marks and citation omitted).

Dr. Marinello's opinion, when considered in light of the entire record as discussed above, including the treatment notes and opinions of Drs. Caloras, Abney, Root, and Knapp, establishes the existence of a mental impairment during the relevant period.  Moreover, the opinion is predicated on medically accepted clinical diagnostic techniques, including Dr. Marinello's own clinical observations during his therapeutic treatment of Manney; his review of "the extensive clinical notes and history" of Manney's prior

treatment with other medical providers; and Manney's results with respect to the MMPI-2 raw test protocol.  (AR 460.)  *See Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) ("[M]edically acceptable clinical and laboratory diagnostic techniques include consideration of [a] patient's report of complaints, or history, [a]s an essential diagnostic tool.") (internal quotations and citation omitted); *Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003) (relying on physical examination results, American College of Rheumatology guidelines, MRI results, and claimant's subjective complaints to support treating physician's diagnosis of severe fibromyalgia and degenerative disc disease).

Even accepting *arguendo* the Commissioner's argument that Dr. Marinello was not Manney's "treating physician," his opinion was still entitled to some weight, as the Second Circuit has held that, when a treating physician's opinion is not given *controlling* weight, the opinion is still entitled to *some* weight, given that such physician "[is] likely to be the medical professional[] most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 404.1527(d)(2).  Under the Commissioner's regulations, the ALJ must consider the following factors when assigning weight to the opinion of a treating source: "(1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) whether the treating physician presents relevant evidence to support an opinion, particularly medical signs and laboratory findings; (4) whether the treating physician's opinion is consistent

with the record as a whole; (5) whether the treating physician is a specialist in the area

relating to her opinion; and (6) other factors which tend to support or contradict the

opinion." *Richardson v. Barnhart*, 443 F. Supp. 2d 411, 417 (W.D.N.Y. 2006) (citing

*Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); 20 C.F.R. § 404.1527(d)(2)-(6)).

When controlling weight is not given to a treating physician's medical opinion, the ALJ

must explain his reasons for the weight he does assign to that opinion. *Richardson*, 443

F. Supp. 2d at 417 (citing *Shaw*, 221 F.3d at 134). Furthermore, the regulations require

that the ALJ "'always give good reasons'" in his decision for the weight he assigns to the

opinions of treating physicians. *Richardson*, 443 F. Supp. 2d at 417 (quoting 20 C.F.R. §

404.1527(d)(2)).

     Here, it is unclear what, if any, weight the ALJ assigned to Dr. Marinello's

opinion. (*See* AR 12.) Moreover, assuming the ALJ assigned *some* weight to such

opinion, he failed to explain his reasons – and certainly failed to give the required "good

reasons." 20 C.F.R. § 404.1527(d)(2)). Nor did the ALJ indicate that he considered any

of the factors set forth above and in the regulations. *See Schall v. Apfel*, 134 F.3d 496,

504-05 (2d Cir. 1998) (ALJ's failure to provide good reasons for according little weight

to treating physician's opinion, and failure to consider all of the factors cited in the

regulations, constituted legal error). Had the ALJ applied such factors, he would have

concluded that Dr. Marinello's opinion is entitled to significant weight.

     First, as noted above, although Dr. Marinello had been treating Manney for only

approximately two months at the time that the opinion was rendered, in those two

months, he had had approximately ten contacts with Manney, including emergency

telephone calls and last minute cancellations.  (AR 460.)  Second, Dr. Marinello's

opinion letter references evidence to support his opinion, including medical notes from

Manney's inpatient psychiatric hospitalizations, the psychological evaluation of Dr.

Knapp, evaluation and progress notes from Drs. Root and Abney, emergency room notes,

and the results from the MMPI-2 raw test protocol.  (*Id.*)  Third, Dr. Marinello's

diagnosis of panic disorder with agoraphobia is consistent with the record as a whole, as

discussed above.  And finally, Dr. Marinello is a specialist in the area relating to his

opinion, psychology.  (*Id.*)

In sum, I recommend finding that the ALJ failed to properly apply the treating

physician rule to Dr. Marinello's August 2008 opinion, and that substantial evidence does

not support the ALJ's determination that such opinion was entitled to little or no weight.

## III.    Disability Onset Date and Title II Benefits

Finally, Manney argues that the Commissioner erred in failing to consider new

and material evidence to establish an onset date of disability consistent with Dr.

Marinello's opinion, and that an onset date consistent with Dr. Marinello's opinion

(1994) is proper and should not have been precluded by *res judicata*.  Manney further

asserts that she should have been found disabled prior to her date last insured, and should

be awarded Title II benefits.

I recommend rejecting these arguments, as the question of Manney's entitlement

to benefits with respect to her 1998 and 2002 claims is not properly before the court.  *See*

*Byam*, 336 F.3d at 184 (declining claimant's invitation to reverse Commissioner's

decision and remand for calculation of benefits, which would effectively grant summary

29

judgment in claimant's favor not only on her due process claim but also on her claim for benefits) (citing *Stieberger*, 134 F.3d. 37).  At this stage of the case, the Commissioner has not considered the merits of Manney's 1998 and 2002 claims, given the ALJ's determination that there was no good cause to reopen them.  The only application currently under review is Manney's April 25, 2006 SSI claim, which could not "become payable until the month after the month in which the application [wa]s filed."  20 C.F.R. § 416.335.  Although I recommend finding that the ALJ erred in determining that Manney's 1998 and 2002 claims should not have been reopened due to Manney's mental incapacity, the substantive merit of those claims will first need to be determined by the Commissioner before being reviewed by this court, if necessary.[11]

## Conclusion

For these reasons, I recommend GRANTING Manney's Motion (Doc. 8), in part,[12] DENYING the Commissioner's Motion (Doc. 10), and REMANDING this matter to the Commissioner to determine the merits of Manney's 1998 and 2002 applications for disability benefits.

---

[11] In a post-hearing brief, relying principally on HALLEX I-2-9-1, I-2-9-20, and I-2-9-40.B.1, Manney asserts that the ALJ should have construed her 2006 application as an implied request for reopening and revision of the decision on her 2002 application, given that (a) both applications alleged the same onset date of disability, (b) the 2006 application was filed within four years of the initial denial of the 2006 application, and (c) new and material evidence was submitted with the 2006 application.  *See* 20 C.F.R. §§ 404.987(b), 404.989(a)(1).  Although I have reviewed both Manney's and the Commissioner's respective post-hearing briefs on this issue (*see* Docs. 16 and 17), given the above analysis and determination, the issue is moot and I therefore recommend that the court refrain from making a finding on the matter.

[12] Manney seeks not only a remand, but also a reversal and remand for calculation of benefits. For the reasons explained above, I recommend that the court decline to grant the latter request, and instead remand with instructions to the Commissioner to reopen and consider the merits of the 1998 and 2002 applications, respectively, and issue a new opinion thereon, based on the proper legal standards and substantial evidence, as discussed herein.

Dated at Burlington, in the District of Vermont, this 23rd day of July, 2010.


/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge